Van Voorhis, J.
The principal basis urged for reversal is the receipt in evidence over objection of testimony by Police Officer Maimone to his previous identification of the defendant from photographs, contrary to the rulings in People v. Cioffi (1 N Y 2d 70, 73) and People v. Hagedorny (272 App. Div. 830), *21 and permitting, also over objection, Detective Lo Curto to bolster his identification by testifying that he observed Officer Maimone identify appellant contrary to the rulings in People v. Trowbridge (305 N. Y. 471); People v. Cioffi (supra); People v. Herrmann (9 N Y 2d 665). Prior to the adoption of section 393-b of the Code of Criminal Procedure in 1927, the rule had long been that it was reversible error even to admit testimony by the witness himself that he had previously identified an accused in person (People v. Jung Hing, 212 N. Y. 393, 401; People v. De Martini, 213 N. Y. 203). The cases consistently hold that this established rule is relaxed by section 393-b of the Code of Criminal Procedure only to the extent of permitting a witness to testify to a previous identification by himself of the defendant in the flesh (People v. Cioffi, supra, p. 73).
The reasons for this rule are well understood. One of the most stubborn problems in the administration of the criminal law is to establish identity by the testimony of witnesses to whom an accused was previously unknown, from quick observation under stress or when, as here, there was no particular reason to note the person’s identity. Where the opportunity for observation is limited and the opportunity and ability of the witness to identify the defendant is questionable, it is all too easy to bolster such testimony by calling a succession of witnesses who swear that they saw and heard him identify the same person upon previous occasions. This tends to give the idea to a jury that there is an impressive amount of testimony to identification when such is really not the fact. As for previous identification from photographs, not only is it readily possible to distort pictures as affecting identity, but also where the identification is from photographs in the rogues’ gallery (even though the name or number on the picture has been excinded) the inference to the jury is obvious that the person has been in trouble with the law before. Such an inference is accentuated where the defendant fails to take the witness stand.
In two instances we have occasionally ignored errors of this kind, either under section 542 of the Code of Criminal Procedure where the evidence of identity is so strong that there is no serious issue upon the point, or in cases such as People v. Singer (300 N. Y. 120) where the evidence would have been admissible, regardless of section 393-b of the Code of Criminal Procedure, *22 in order to confirm the veracity of testimony attacked as a recent fabrication by showing previous declarations of the same tenor before the motive to falsify existed. Neither of those situations exists here.
This appeal involves the killing of a man named Daniel Iglesia, known as “ Danny ”. He and the defendant had for a short time been partners in a business enterprise, which terminated, several weeks prior to his death.
The most complete account of this bizarre homicide is given by the witness Buth Bailey, who testified that she resides at 178 Avenue D on the 6th floor; that on March 31, 1964 at about 10:30 p.m. she was looking out the window in her bedroom which faced Avenue D. Her attention was attracted to someone trying to park a black car and then she heard “ something like firecrackers or something popping ”. Then she saw a fellow getting out of the passenger seat of the car. He went across the street and she lost sight of him. She noticed the car moving forward, going north, at a very slow rate of speed; she saw someone lying in the street. The person she saw was a man and she observed a man coming out of the driver’s seat of the car and the car hit a fire hydrant. She saw that the man had an object in his hand and that he was pointing it at the fellow who was lying on the street. She then heard “ clicks, sounds, loud sounds.” The man on the ground was saying, “ No, No ”. The other man walked back to the car; he backed away and went up 12th Street. She phoned the police. She was looking out of the window, while still talking on the telephone, and she saw a black shiny car that looked like the one she had seen before. The car was coming up Avenue D very slowly and then she said it began to speed up and it hit the fellow who was lying in the street. The car ran completely over him; the car continued west on 13th Street. She also noticed that, before the ear descended upon the deceased, there was a man who was talking to the deceased. This man jumped out of the way when the car came down on him.
This testimony was supplemented, in some of its details, by testimony of other witnesses, which leaves no doubt that the incident occurred substantially as Buth Bailey testified. With the exception of Patrolman Joseph Maimone, none of them connected defendant directly with the crime. Bose Anne Iglesia, *23 widow of the deceased, testified that she owned a 1964 black Oldsmobile, a Dynamic 88, which she stored at the Brown Derby Garage, 196 Mulberry Street, Manhattan. A garage man testified that it was taken out that night by the deceased and another man, who was identified as having been also with the defendant upon that evening. Her black Oldsmobile was identified by Patrolman Maimone and others as having been the car at the scene. Two spent shells were found in it when it was discovered by the police parked opposite a fire hydrant three days later. These shells found in the automobile were not identified with any particular revolver, but a revolver was found on the morning after the homicide by a Marie Corio under the door mat in front of her door which had been moved “ all to one side of the corner Her apartment was 4-A at 209 Mulberry Street, Manhattan, which directly adjoined apartment 4-B that was occupied by defendant. The ballistic testimony indicated that it was the gun which fired the bullet that was extracted from the body of the victim at the hospital. The autopsy showed that Iglesia died as a result of gunshot wounds and “ blunt force ” injuries.
This evidence, coupled with eyewitness testimony that there had been three men in the auto, creates, at most, a mere suspicion that defendant was involved in the homicide. There is nothing to show how defendant acquired the revolver, if he did acquire it, which was never proved to have been in his possession. The circumstance that it was found outside of his door is hardly enough to prove that he put it there. It might even indicate that someone else had left it there in order to cast suspicion upon defendant. None of the testimony enumerated connects defendant with the commission of' this crime.
For that, the People relied entirely upon the testimony of Patrolman Maimone, whose radio motor patrol car was standing at 10 :30 on the evening in question on the southeast corner of ,13th Street and Avenue B, Manhattan, near 12th Street and Avenue D where the homicide occurred. Maimone was accompanied by Patrolman Mulvey, the driver, who was not a witness. Another police radio car had stopped abreast of their vehicle, and the two patrolmen in it were in conversation with Mulvey. Maimone said he took no part in the conversation, continued to look straight ahead, north, and noticed a black, 1964 Oldsmobile *24 with whitewall tires, and an electrical antenna protruding from the rear right fender, going from east to west on 13th Street. As the car reached the middle of the intersection, he testified that it swerved toward the patrol car, and that the driver gave him a “ full stare ”. The black car straightened out and continued west on 13th Street. The swerving incident had not been mentioned in his report. This was the only opportunity which Maimone had to identify defendant as the perpetrator of the crime. At the moment when he observed him, he did not know that the homicide had occurred,- and Maimone had no particular reason for noting and remembering the identity of this driver. Maimone identified the defendant in court as the driver of the car. About two minutes after seeing him in the black Oldsmobile, he received a radio call, whereupon he and his partner proceeded to 12th Street and Avenue D discovering Iglesia lying on his back, bleeding profusely from the face, staring at the sky. Shortly thereafter, the other patrol car arrived bearing the other two patrolmen. An ambulance came and the injured man was taken to Bellevue Hospital. Three days later Maimone identified a black Oldsmobile which had been discovered by a fire hydrant on 18th Street near Second Avenue as being the one which he had seen defendant driving just before the homicide.
It thus appears that the entire evidence connecting defendant with the crime is the split-second observation by Patrolman Maimone, at 10:30 p.m. in the winter time, through his window and that of the oncoming black Oldsmobile. This observation was made when there was no apparent occasion to take notice of who the driver was unless, perhaps, because, as the officer subsequently recalled, the vehicle swerved in his direction as it was passing by. The question of identification was of utmost importance in the case. It was doubtless for that reason that the prosecution attempted to bolster Maimone’s testimony of identification in the manner indicated at the beginning of this opinion.
The only justification asserted by the People is the contention that Maimone’s testimony was attacked on cross-examination as a “ recent fabrication” and that the People were entitled to introduce this evidence in order to rehabilitate his credibility after what occurred on cross-examination. If the People were entitled to do that under the circumstances of this case, it would *25 annul the decisions on this entire subject before and after the enactment of section 393-b of the Code of Criminal Procedure. Few are the criminal actions in which an attempt is not made on cross-examination to impair the credibility of key witnesses for the prosecution. If, whenever that happens concerning an issue of identity, the witness and collateral witnesses are permitted to do what was done in this case, there will be little left of these well-established and reasonable rules. The cases cited for the People upon this point are People v. Marrero (16 N Y 2d 994); People v. Singer (300 N. Y. 120, supra); People v. Jennings (23 A D 2d 621); People v. Hagedorny (272 App. Div. 830, supra). These cases are not in point. In People v. Hagedorny, a new trial was granted, mainly on account of identification from photographs, with the comment by the Appellate Division that ‘1 We are unable to say that the errors referred to were unsubstantial.” The leading case is People v. Singer, where convictions of manslaughter and abortion were affirmed notwithstanding the admission into evidence of proof of a prior extra-judicial ‘ ‘ consistent statement ’ ’ made by an accomplice named Schneidewind, who admitted on the trial that he had made statements before the Grand Jury which did not inculpate the defendant. When giving his evidence in chief at the trial, he told the jury that he, with defendant and another accomplice, had, just after the abortion, concocted a false story which he abandoned after being arrested while the Grand Jury were still sitting. Then, before the same Grand Jury, he recanted his prior testimony and related the same version of the occurrence to which he later testified on the trial. During his cross-examination on the trial, defense counsel brought out that, although guilty on his own story, he (Schneidewind) had not been indicted. By these and other questions, “ the defense at least suggested to the jury that Schneidewind hoped for clemency for himself, and that his trial testimony was a fabrication, as a reward for which he hoped to go unwhipped of justice.” (300 N. Y., supra, p. 123, per Desmond, J.). The prosecutor then called a rebuttal witness, the father of the victim of the abortion, who was permitted to tell the jury that, on the day following the abortion, Schneidewind had told the father the same things that he told the jury on the trial. These circumstances of the Singer case opened the door to that testimony of the father on rebuttal, inasmuch as not until after *26 Schneidewind had been arrested, and was directly faced with the likelihood of being indicted, did the motive to falsify come into being. The following quotation from the opinion shows the rationale (300 N. Y., supra, pp. 123-124): “ The contention is that this rebuttal did not come within the exception to the hearsay rule, stated by this court in Ferris v. Sterling (214 N. Y. 249, 254), People v. Edwards (282 N. Y. 413, 416) and Crawford v. Nilan (289 N. Y. 444, 450) as follows:1 where the testimony of a witness is assailed as a recent fabrication, it may be confirmed by proof of declarations of the same tenor before the motive to falsify existed.’ Defendant says that two essential bases for the application of that exception are missing here: first, in that Schneidewind’s trial testimony was not claimed by the defense to have been a recent fabrication, since it was the same story he had told before the grand jury a year earlier, and also at an earlier trial of this very case; and, second, in that, according to defendant, there was no sufficient accusation or showing here of any motive to falsify, arising after the disclosure to the father and before the first telling of Schneidewind’s present version of the facts. We think both conditions necessary for the use of the exception, were fairly present here.”
A similar situation was disclosed in People v. Marrero (16 N Y 2d 994, supra). Moreover, the evidence of identification in Marrero was otherwise very convincing. In People v. Jennings (23 A D 2d 621, supra), cited by the People, the conviction was reversed. That accords with People v. Owens (18 N Y 2d 972), decided herewith.
The basis on which the People seek to justify the admission of this testimony is that on cross-examination Patrolman Maimone was questioned concerning whether he had told anybody that he was going to become a detective as a result of this case. He denied having said such a thing. Officer Lo Curto was asked on cross-examination whether he had ever asked a Mrs. Sachs: “ Did [Maimone] ever tell you he hopes to be promoted because of the testimony he’s given, in this case? ” This was denied by Lo Curto also. In his summation, defense counsel argued the possibility that Maimone was expecting promotion on this account.
It was legitimate for defense counsel to argue to the jury the possibility that police officers may be looking for promotion in *27 helping to solve unsolved crimes, and that this may motivate them to twist the truth in order to get convictions. But if wherever a lawyer for a defendant argues that the police want to solve a crime, and that, therefore, their credibility may be suspect, it would open the door to the People to show prior identification from photographs in the rogues’ gallery or to prove prior identification by other witnesses, contrary to the established law, there would be little left of these salutary rules.
The judgment of conviction should be reversed and a new trial granted.
Chief Judge Desmond and Judges Fuld, Burke, Scileppi, Bergan and Keating concur.
Judgment reversed and a new trial ordered.